**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| TERRY BOURNE, ALIZA DETTMERS, and BRENDA HIMMELSPACH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RODENBURG LLP, d/b/a RODENBURG LAW FIRM, LLP,<br><br>Defendant. | Case No. ____________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs Terry Bourne, Aliza Dettmers, and Brenda Himmelspach ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Defendant Rodenburg LLP, d/b/a Rodenburg Law Firm, LLP ("Rodenburg" or "Defendant"), alleging as follows, based upon personal knowledge as to himself and information and belief as to all other matters, including investigation of counsel.

## I. INTRODUCTION

1. This class action arises from Rodenburg's failure to properly secure and safeguard the highly sensitive protected health information ("PHI") and personally identifiable information ("PII") of Plaintiffs and approximately 81,307 Class Members, which as a result was stolen from Rodenburg's systems in a foreseeable, preventable data breach (the "Data Breach").

2. Rodenburg is a debt-collection and creditors'-rights law firm headquartered in Fargo, North Dakota that represents collection agencies, lending institutions, auto and consumer finance companies, debt buyers, healthcare organizations, and other creditors in credit matters, including consumer and commercial collections across multiple Midwestern states.

3. In the course of providing those services, Rodenburg acquired, received, and maintained Plaintiffs' and Class Members' PII and PHI. Rodenburg could not perform its regular business activities or generate revenue without collecting and maintaining that information, and on information and belief retained it for many years—even after its relationships with the underlying creditor-clients ended.

4. According to Rodenburg's notice to Plaintiffs and Class Members, "[o]n August 26, 2025, Rodenburg discovered potentially anomalous activity in its environment." Rodenburg's subsequent investigation revealed that an unknown third party had obtained "unauthorized access into the Rodenburg network environment" for a "short span of time," during which "certain files in the Rodenburg environment were exposed to the unauthorized actor."

5. Rodenburg has stated that its investigation of the impacted data did not conclude until March 20, 2026—nearly seven months after Rodenburg discovered the unauthorized access. Only after that date did Rodenburg begin notifying Plaintiffs and Class Members that their Private Information had been compromised.

6. Rodenburg's notice letters (the "Notice Letters") confirmed that the Data Breach exposed a wide range of sensitive personal data, including names, Social Security numbers, dates of birth, payment card numbers, medical conditions, and treatment information (collectively, the "Private Information").

7. On or about December 10, 2025—nearly four months after Rodenburg discovered the intrusion, but still over three months before Rodenburg notified the affected individuals—the Akira ransomware group publicly claimed responsibility for the cyberattack on its dark-web data leak site. Akira asserted that it had exfiltrated approximately 144 gigabytes of corporate data from Rodenburg, including detailed employee information (passports, driver's licenses, and other identification documents), confidential legal files, court hearings, and client information.

8. Upon information and belief, the cyberattack methodology used here—an Akira-style ransomware intrusion typified by initial access through compromised credentials or unpatched perimeter services, lateral movement, mass exfiltration of file shares, and double-extortion encryption—was a known and well-documented risk to debt-collection law firms like Rodenburg. Rodenburg knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition.

9. Law firms that handle consumers' Private Information, like Rodenburg, owe the individuals to whom the information relates a duty to adopt reasonable measures to protect that information from disclosure to or theft by unauthorized third parties, and to keep that information safe and confidential. This duty arises under contract, statutory and common law, professional rules of ethics, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that hackers with nefarious intentions will target the Private Information and use it to harm the affected individuals.

10. The Data Breach—which Rodenburg failed to detect until cybercriminals had already accessed and stolen Plaintiffs' and Class Members' Private Information—is the direct result of Rodenburg's failure to implement basic data security measures or oversight over

consumers' data in its custody and control. Had Rodenburg implemented reasonable cybersecurity measures, including adequate safeguards for initial access, multi-factor authentication, encryption or redaction of personal data elements, network segmentation, regular vulnerability scanning, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity, criminals would not have been able to penetrate Rodenburg's network, perform reconnaissance to locate Private Information, and exfiltrate approximately 144 gigabytes of data before being detected.

11. Rodenburg failed to adequately protect Plaintiffs' and Class Members' Private Information—and failed even to encrypt or redact this highly sensitive data while it was maintained on Rodenburg's internet-accessible network without adequate safeguards against unauthorized access and exfiltration. Plaintiffs' and Class Members' unencrypted, unredacted Private Information was compromised due to Rodenburg's negligent acts and omissions and utter failure to protect it.

12. Rodenburg breached its duties and obligations by failing in one or more of the following ways: (i) to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (ii) to design, implement, and maintain reasonable data retention and destruction policies; (iii) to adequately train employees and oversee service providers regarding data security; (iv) to comply with industry-standard data security practices, including the NIST Cybersecurity Framework Version 2.0 and the Center for Internet Security's Critical Security Controls; (v) to warn Plaintiffs and Class Members of Rodenburg's inadequate data security practices; (vi) to encrypt or adequately encrypt the Private Information that was stored on Rodenburg's network; (vii) to recognize, detect, or contain the intrusion in a timely manner so as to mitigate harm; (viii) to utilize widely

available software able to detect and prevent this type of attack; and (ix) to otherwise adequately secure the Private Information using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

13. Hackers targeted and obtained Plaintiffs' and Class Members' Private Information from Rodenburg because of the data's value in exploiting and stealing identities. As a direct and proximate result of Rodenburg's inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiffs' and Class Members' Private Information was accessed and acquired by cybercriminals and exposed to an untold number of unauthorized individuals. The present and continuing risk to Plaintiffs and Class Members will remain for their respective lifetimes.

14. The harm resulting from a cyberattack like this Data Breach manifests in numerous ways, including identity theft, medical and financial fraud, tax fraud, fraudulent account openings, dark-web sale of the Private Information, and targeted phishing and social-engineering attacks. The exposure of an individual's Private Information—particularly information including a Social Security number, date of birth, payment card number, and medical condition—ensures that the individual will be at a substantially increased and certainly impending risk of identity theft and medical fraud for the remainder of his or her life.

15. Although Rodenburg discovered the unauthorized activity on August 26, 2025, it waited until after March 20, 2026 to notify the affected individuals—an unjustified delay of approximately seven months. To make matters worse, the Notice Letters omitted critical information, including (i) the root cause of the Data Breach; (ii) the specific vulnerabilities exploited; (iii) the identity of the perpetrator (which Rodenburg was on notice of as of

December 10, 2025, when Akira publicly claimed credit); (iv) whether Rodenburg paid a ransom for Plaintiffs' and Class Members' Private Information; and (v) the remedial measures undertaken to ensure such a data breach does not occur again.

16. Rodenburg's offer of only twelve (12) months of free credit monitoring through TransUnion, with a 90-day enrollment deadline, is grossly inadequate to address the lifetime risk of identity theft, medical-identity fraud, and other harms posed by the disclosure of Social Security numbers, dates of birth, payment card numbers, and medical information.

17. As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact, including but not limited to: (i) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (ii) loss of time and productivity incurred mitigating that risk; (iii) actual identity theft and fraud; (iv) financial costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) deprivation of value of their Private Information; (vii) loss of privacy; (viii) emotional distress, including anxiety and stress in dealing with the Data Breach; and (ix) the continued risk to their sensitive Private Information, which remains in Rodenburg's possession and is subject to further breaches.

18. To recover for these harms, Plaintiffs, on behalf of himself and the Class as defined herein, brings claims for (i) negligence and negligence per se; (ii) breach of implied contract; (iii) breach of third-party beneficiary contract; (iv) unjust enrichment; (v) invasion of privacy; (vi) violation of the North Dakota Notice of Security Breach for Personal Information statute, N.D. Cent. Code § 51-30-01 et seq.; (vii) violation of the North Dakota Unlawful

Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-01 et seq.; and (viii) declaratory and injunctive relief.

19. Plaintiffs and Class Members seek compensatory, nominal, statutory, and punitive damages, declaratory judgment, and injunctive relief requiring Rodenburg to (i) disclose, expeditiously, the full nature of the Data Breach and the types of Private Information exposed; (ii) implement improved data security practices to reasonably guard against future breaches of Private Information in Rodenburg's possession; and (iii) provide, at Rodenburg's own expense, all impacted Data Breach victims with lifetime credit monitoring and identity-theft protection services—not the inadequate twelve months Rodenburg has offered.

## II. PARTIES

***Plaintiffs***

20. Plaintiff Terry Bourne is a citizen of the State of North Dakota and is domiciled in Sheldon, Ransom County, North Dakota. Plaintiff Bourne received a Notice Letter from Rodenburg notifying him that his name, Social Security number, date of birth, payment card number, medical condition information, and treatment information were compromised in the Data Breach.

21. Plaintiff Aliza Dettmers is a citizen of the State of Wyoming and is domiciled in Cheyenne, Laramie County, Wyoming. Plaintiff Dettmer received a Notice Letter from Rodenburg notifying her that her name, Social Security number, date of birth, payment card number, medical condition information, and treatment information were compromised in the Data Breach.

22. Plaintiff Brenda Himmelspach is a citizen of the State of North Dakota and is domiciled in Mandan, Morton County, North Dakota. Plaintiff Himmelspach received a Notice Letter

from Rodenberg notifying her that her name, Social Security number, date of birth, payment card number, medical condition information, and treatment information were compromised in the data breach.

***Defendant***

23. Defendant Rodenburg Law Firm, LLP is a limited liability partnership organized under the laws of the State of North Dakota with its principal place of business located at 4500 19th Avenue South, Fargo, North Dakota, 58103.

24. Rodenburg holds itself out as a creditors'-rights and debt-collection law firm that provides legal services in North Dakota, Minnesota, South Dakota, Montana, Wyoming, and other states, working to resolve delinquency in pre-charge-off and post-charge-off accounts on behalf of collection agencies, commercial forwarders, lending institutions, auto and consumer finance companies, debt buyers, state colleges, healthcare organizations, and other creditors.

## III. JURISDICTION AND VENUE

25. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a putative class action in which the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed Class; and at least one member of the Class—including Class Members domiciled in Minnesota, Montana, South Dakota, Wyoming, and other states outside North Dakota—is a citizen of a State different from the State of which Rodenburg is a citizen.

26. The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the federal claims arising under the Class Action Fairness Act.

27. This Court has personal jurisdiction over Rodenburg because Rodenburg is organized under the laws of, headquartered in, and maintains its principal place of business in North Dakota; regularly conducts business in North Dakota; and because the acts and omissions giving rise to Plaintiffs' and the Class's claims occurred in and emanated from North Dakota.

28. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Rodenburg resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District, including the conduct, storage, and exposure of Plaintiffs' and Class Members' Private Information at Rodenburg's North Dakota offices and on its North Dakota-based information-technology infrastructure.

29. Assignment to the Western Division is proper pursuant to D.N.D. Civ. L.R. 3.1.

## IV. FACTUAL ALLEGATIONS

### *A. Rodenburg Collects and Maintains Sensitive Private Information.*

30. Rodenburg is headquartered in Fargo, North Dakota, and provides creditors'-rights and debt-collection services to financial institutions, lenders, debt buyers, auto and consumer finance companies, healthcare organizations, and other creditors throughout the Upper Midwest.

31. In connection with the services Rodenburg provides, Rodenburg collects, receives, and stores Plaintiffs' and Class Members' Private Information, including names, dates of birth, Social Security numbers, payment card numbers, financial-account numbers, medical conditions, and treatment information.

32. Rodenburg derives substantial economic benefits from collecting and using Plaintiffs' and Class Members' Private Information. Without the required transmission and maintenance

of that Private Information, Rodenburg could not perform its operations, furnish the services it provides, or receive payment for those services.

33. Because Rodenburg's creditor-clients include healthcare organizations, Rodenburg routinely receives and maintains sensitive medical condition and treatment information of patients—information that constitutes "protected health information" within the meaning of HIPAA.

34. At all relevant times, Rodenburg knew it was storing and using its network to store and transmit valuable, sensitive Private Information—including PHI—and that, as a result, its systems would be attractive targets for cybercriminals.

35. In exchange for receiving Plaintiffs' and Class Members' Private Information, Rodenburg expressly and impliedly promised to safeguard the sensitive and confidential data, to use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it. Rodenburg's public-facing privacy statement and its representations to clients reflect those promises.

36. Plaintiffs' and Class Members' Private Information was provided to Rodenburg with the reasonable expectation and mutual understanding that Rodenburg would comply with its obligations to keep such information confidential and protected.

37. The data Rodenburg held in its network systems at the time of the Data Breach included unencrypted Private Information of Plaintiffs and Class Members.

***B. Rodenburg Owed Duties to Adopt Reasonable Data Security Measures.***

38. Rodenburg had and continues to have duties to adopt reasonable measures to keep Plaintiffs' and Class Members' Private Information confidential and protected from disclosure to unauthorized third parties, and to audit, monitor, and verify the integrity of its network where Private Information is stored.

39. Rodenburg had and has obligations stemming from Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45; the Gramm-Leach-Bliley Act and its implementing FTC Safeguards Rule, 16 C.F.R. Part 314; the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.; the Health Insurance Portability and Accountability Act ("HIPAA"), 45 C.F.R. Parts 160 and 164, and the Health Information Technology for Economic and Clinical Health Act ("HITECH"), 42 U.S.C. § 17921 et seq.; the North Dakota Notice of Security Breach for Personal Information statute, N.D. Cent. Code ch. 51-30; the North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code ch. 51-15; common law; contract; the North Dakota Rules of Professional Conduct; and industry standards.

40. Because Rodenburg receives PHI from healthcare-organization clients in connection with debt-collection-related legal services, Rodenburg is a "business associate" within the meaning of HIPAA, 45 C.F.R. § 160.103, and is required to comply with HIPAA's Privacy Rule and Security Rule.

41. By obtaining, using, and benefitting from Plaintiffs' and Class Members' Private Information as a debt-collection law firm, Rodenburg assumed legal and equitable duties and knew or should have known it was responsible for protecting that Private Information from unauthorized access and disclosure.

42. Upon information and belief, all contracts Rodenburg entered into with its creditor-clients required Rodenburg to implement and maintain reasonable, adequate, and legally compliant cybersecurity measures to protect the Private Information it collected against unauthorized disclosure and exfiltration. Plaintiffs and Class Members were and are the intended beneficiaries of those contractual obligations.

43. Rodenburg owed the foregoing duties to protect Private Information maintained on its network systems from unauthorized disclosure and had the practical ability to fulfill those duties—yet failed to do so.

***C. The Data Breach.***

44. According to Rodenburg's own Notice Letters, "[o]n August 26, 2025, Rodenburg discovered potentially anomalous activity in its environment." Rodenburg has acknowledged that "[f]urther assessment and investigation into the observed activity revealed unauthorized access into the Rodenburg network environment by an unknown third party for a short span of time," and that "certain files in the Rodenburg environment were exposed to the unauthorized actor."

45. Rodenburg has further stated that its "thorough investigation of the impacted data . . . concluded on March 20, 2026." Only after that date did Rodenburg notify Plaintiffs and Class Members that their Private Information had been compromised.

46. Rodenburg's Notice Letters confirmed that the Private Information exposed in the Data Breach included names, Social Security numbers, dates of birth, payment card numbers, medical conditions, and treatment information.

47. On or about December 10, 2025—approximately 3.5 months after Rodenburg detected the intrusion, but more than three months before Rodenburg notified affected individuals—the Akira ransomware group publicly claimed responsibility for the cyberattack on its dark-web data leak site. Akira asserted that it had stolen approximately 144 gigabytes of corporate data from Rodenburg, including detailed employee information (passports, driver's licenses, and other identification documents), confidential legal files, court hearings, and client information.

48. Akira is a well-known ransomware gang that first emerged in March 2023 and has targeted small- to medium-sized businesses in education, finance, manufacturing, real estate, healthcare, and—increasingly—the legal sector. Akira's malware both encrypts computer systems and exfiltrates data; the group then demands a ransom in exchange for restoring those systems and not publishing the stolen data on its leak site.

49. Akira's targeting of U.S. law firms is publicly documented and has been on the rise. In addition to Rodenburg, Akira publicly claimed credit in 2025 for ransomware attacks against, among others, Cohn Lifland Pearlman Herrmann & Knopf (NJ); Murphy, Pearson, Bradley & Feeney (CA); Martin Showers Smith & McDonald (TX); Imblum Law Offices (PA); Cutcliffe Archetto & Santilli (RI); Markowitz, Ringel, Trusty & Hartog (FL); Gorlick, Kravitz & Listhaus (NY); and Gregory A. Burrell Chapter 13 Trustee (MN). The risk of an Akira-style attack on a debt-collection law firm with a large repository of consumer Private Information was, accordingly, both well-known and foreseeable to Rodenburg long before August 26, 2025.

50. This Data Breach is, by reported account, the largest known data breach affecting a U.S. law firm by number of records compromised.

51. Omitted from Rodenburg's Notice Letters were (i) the root cause of the Data Breach; (ii) the specific vulnerabilities exploited; (iii) confirmation of the identity of the perpetrator (notwithstanding Akira's public claim of responsibility on or about December 10, 2025); (iv) whether Rodenburg paid a ransom demand for Plaintiffs' and Class Members' Private Information; (v) the amount of any ransom demanded; and (vi) the remedial measures undertaken to ensure such a data breach does not occur again. Without these critical facts,

Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

52. Rodenburg's purported remediation—12 months of free credit monitoring through TransUnion, with a 90-day enrollment deadline—is plainly inadequate to mitigate the lifetime harms posed by the disclosure of Social Security numbers, dates of birth, payment card numbers, and medical condition and treatment information. Identity-theft and medical-fraud risks from this Data Breach will persist long after Rodenburg's 12-month offering expires.

53. Had Rodenburg implemented standard and reasonable digital-forensic measures, such as time-stamping, intrusion-detection systems, robust logging, network segmentation, and endpoint detection and response, it would have been prepared for a forensic investigation of compromised information and would not have needed nearly seven months from intrusion detection to notification to identify the Private Information involved or the individuals impacted. These failures exacerbated Plaintiffs' and Class Members' damages, including actual damages in the form of lost opportunity costs, by delaying and obfuscating Rodenburg's notice of the Data Breach and depriving Plaintiffs and Class Members of crucial time to mitigate and address it.

54. As the Data Breach and its timeline evidence, Rodenburg did not use reasonable security measures appropriate to the nature of the sensitive Private Information collected from Plaintiffs and Class Members and maintained on Rodenburg's network, such as encrypting the information, deleting the data when it was no longer needed, requiring multi-factor authentication for accounts with access to servers storing Private Information, training employees about cybersecurity, investigating and remediating vulnerabilities in its data-

security practices, and implementing the necessary safeguards to enable Rodenburg to identify malicious activity and curtail it when it happens.

***D. The Risk of an Akira-Style Cyberattack Was Known and Foreseeable.***

55. Rodenburg's negligence in failing to safeguard Plaintiffs' and Class Members' Private Information is exacerbated by the repeated, public, and industry-wide warnings and alerts directed at protecting and securing sensitive data—and at law firms in particular.

56. Private Information of the kind compromised in the Data Breach is of great value to cybercriminals, as it can be used for a variety of unlawful and nefarious purposes, including ransomware extortion, fraudulent misuse, and sale on the dark-web underground.

57. Cyberattacks against debt collectors and creditors'-rights law firms have grown markedly in recent years. Comparitech researchers logged 36 confirmed ransomware attacks on U.S. law firms in 2025 alone, in which firms in turn notified more than 318,000 data-breach victims. Akira, in particular, was responsible for at least nine confirmed law-firm attacks in 2025 prior to the Rodenburg incident—putting Rodenburg on actual or constructive notice that it was a likely target.

58. As a business in possession of consumers' Private Information—including Social Security numbers, dates of birth, payment card numbers, medical conditions, and treatment information—Rodenburg knew, or should have known, the importance of safeguarding that information and the foreseeable consequences if its network were breached. Nevertheless, Rodenburg failed to implement or follow reasonable cybersecurity measures to protect against the foreseeable harm of this Data Breach.

***E. Law Firms Have Heightened Ethical and Professional Duties to Protect Client Information.***

59. Under Rule 1.6(c) of the North Dakota Rules of Professional Conduct, a lawyer "shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client." Rodenburg's ethical obligation to implement reasonable data security extends to North Dakota Rule of Professional Conduct 1.1, which requires lawyers to maintain technical competence regarding the benefits and risks associated with relevant technology.

60. The American Bar Association has issued multiple ethics opinions, including ABA Formal Opinion 477R (Securing Communication of Protected Client Information), ABA Formal Opinion 483 (Lawyers' Obligations After an Electronic Data Breach or Cyberattack), and ABA Formal Opinion 498 (Virtual Practice), all of which provide guidance on cybersecurity. Rodenburg failed to take reasonable efforts to protect Plaintiff's and the Class's Private Information in violation of these professional and ethical obligations.

***F. Rodenburg Failed to Comply With FTC Rules and Industry Standards.***

61. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect personal information.

62. As a debt collector that handles consumer financial information, Rodenburg is also subject to the Gramm-Leach-Bliley Act and its implementing Safeguards Rule, 16 C.F.R. Part 314, which requires Rodenburg to develop, implement, and maintain a comprehensive information-security program with administrative, technical, and physical safeguards appropriate to the sensitivity of the consumer information it handles. The Safeguards Rule, as updated effective June 9, 2023, mandates specific safeguards including access controls, encryption of customer information at rest and in transit, multi-factor authentication, regular security testing, employee training, and a written incident-response plan.

63. Rodenburg failed to comply with industry-standard cybersecurity frameworks, including the NIST Cybersecurity Framework Version 2.0 and the Center for Internet Security's Critical Security Controls (CIS CSC), which together establish reasonable cybersecurity readiness for entities maintaining sensitive personal information.

64. Specifically, Rodenburg failed to: (a) implement an awareness-and-training program for personnel; (b) enable strong spam filters and phishing protection; (c) configure firewalls to block known-malicious IP addresses; (d) timely patch operating systems, software, and firmware; (e) require multi-factor authentication for remote and privileged access; (f) apply the principle of least privilege; (g) segment networks to limit lateral movement; (h) encrypt data at rest and in transit; (i) maintain a tested and effective incident-response plan; and (j) properly retain and dispose of consumer Private Information.

***G. Rodenburg Was Required, but Failed, to Comply with HIPAA.***

65. As a business associate of healthcare-organization creditor-clients, Rodenburg is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A, C, D, and E, with respect to the PHI it receives, creates, maintains, or transmits.

66. Among other things, HIPAA's Security Rule required and requires Rodenburg to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (d) ensure compliance by its workforce. 45 C.F.R. § 164.306(a).

67. HIPAA further required Rodenburg to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to

allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

68. HIPAA's Breach Notification Rule, 45 C.F.R. § 164.404(b), required Rodenburg to notify each affected individual of a breach of unsecured PHI without unreasonable delay and in no case later than 60 days after discovery of the breach. Rodenburg's seven-month delay in notifying Plaintiffs and Class Members violates that requirement.

69. Rodenburg violated HIPAA and HITECH by, among other things, (a) failing to maintain adequate security practices, systems, and protocols to prevent the loss of PHI; (b) failing to mitigate the risks of a data breach; (c) failing to ensure the confidentiality and protection of PHI; (d) failing to use appropriate safeguards to prevent the unauthorized disclosure of Plaintiffs' and Class Members' PHI; and (e) failing to provide the required Data Breach notice within 60 days of discovery.

***H. Rodenburg Failed to Provide Timely and Adequate Notice.***

70. North Dakota law requires "any person that owns or licenses computerized data that includes personal information" to disclose any breach of the security of the system to any resident of North Dakota whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person. The disclosure must be made "in the most expedient time possible and without unreasonable delay," consistent with any necessary measures to determine the scope of the breach and restore reasonable integrity of the data system. N.D. Cent. Code § 51-30-02(1).

71. If a breach involves more than 250 individuals, North Dakota law also requires the entity to disclose the breach to the Attorney General of North Dakota by mail or email. N.D. Cent. Code § 51-30-02(2).

72. Rodenburg failed to comply with these obligations by, among other things, unreasonably delaying notice to Plaintiffs and Class Members—waiting from August 26, 2025, to a date after March 20, 2026, to notify the affected individuals—and failing to disclose the full nature, scope, root cause, and remediation of the Data Breach.

***I. Plaintiff and Class Members Suffered Common Injuries and Damages.***

73. Rodenburg's failure to implement or maintain adequate data-security measures for Plaintiffs' and Class Members' Private Information directly and proximately injured Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

74. The ramifications of Rodenburg's failures are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

75. Plaintiffs and Class Members are also at a continued risk because their Private Information remains in Rodenburg's systems, which have already been shown to be susceptible to compromise and are subject to further attack.

76. Plaintiffs have experienced and will continue to experience economic and non-economic injuries traceable to the Data Breach, including but not limited to: invasion of privacy; financial costs incurred mitigating the materialized risk and imminent threat of identity theft; loss of time and lost productivity incurred mitigating that risk; financial costs incurred due to actual identity theft; loss of time incurred due to actual identity theft; deprivation of the value of their Private Information; loss of the benefit of the bargain; emotional distress, including anxiety and stress; and the continued risk to sensitive Private Information.

77. Following the Data Breach, Plaintiffs have experienced a marked increase in spam, phishing, and social-engineering attempts directed at them by means of email, telephone, and text message; have spent substantial time monitoring accounts and credit reports; and remain at substantial and imminent risk of further identity theft, payment-card fraud, and medical-identity fraud—including the possibility that their medical condition and treatment information could be used to obtain prescriptions, file fraudulent insurance claims, or harass or extort them.

78. Social Security numbers, in particular, are among the worst kind of personal information to have been stolen because they may be put to numerous serious fraudulent uses and are extraordinarily difficult for an individual to change. As the Social Security Administration warns, "A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name."

79. PHI, like that disclosed in the Data Breach, is particularly valuable to cybercriminals because it can be used to target victims with frauds and scams that take advantage of their medical conditions, file fake insurance claims, gain access to prescriptions for illegal use or resale, or harass or extort patients.

## V. CLASS ACTION ALLEGATIONS

80. Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), and seek to represent the following nationwide class (the "Class"):

> *All individuals residing in the United States whose Private Information was compromised in the Data Breach announced by*

> *Rodenburg Law Firm, LLP, including all persons to whom Rodenburg sent a Notice Letter regarding the Data Breach.*

81. Plaintiffs also seek to represent the following subclass (the "North Dakota Subclass"):

> *All individuals residing in the State of North Dakota whose Private Information was compromised in the Data Breach announced by Rodenburg Law Firm, LLP.*

82. Excluded from the Class and Subclass are: Rodenburg and its parents, subsidiaries, affiliates, officers, partners, members, and directors, and any entity in which Rodenburg has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

83. Plaintiffs reserve the right to amend the definition of the Class and Subclass, or to add additional classes or subclasses, if discovery indicates that the definitions should be narrowed, expanded, or otherwise modified.

84. **Numerosity (Fed. R. Civ. P. 23(a)(1)).** The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Class includes approximately 81,307 individuals. The Class is identifiable within Rodenburg's records, and Rodenburg has already identified Class Members—as evidenced by sending them Notice Letters.

85. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), (b)(3)).** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members, including:

a. Whether Rodenburg had a duty to protect Plaintiffs' and Class Members' Private Information;

b. Whether Rodenburg breached its duty to safeguard Plaintiffs' and Class Members' Private Information;

c. Whether Rodenburg implemented and maintained reasonable data-security measures appropriate to the nature and scope of the Private Information at issue;

d. Whether Rodenburg, as a HIPAA business associate, complied with the HIPAA Privacy Rule, Security Rule, and Breach Notification Rule;

e. Whether and when Rodenburg actually learned of the Data Breach;

f. Whether Rodenburg adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g. Whether Rodenburg violated N.D. Cent. Code § 51-30-02 by failing to provide timely and adequate notice;

h. Whether Rodenburg violated the North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code ch. 51-15;

i. Whether Rodenburg adequately addressed and remediated the vulnerabilities that permitted the Data Breach to occur;

j. Whether Plaintiffs and Class Members are entitled to actual, statutory, and/or nominal damages as a result of Rodenburg's wrongful conduct; and

k. Whether Plaintiffs and Class Members are entitled to injunctive and declaratory relief, including lifetime credit-monitoring and identity-theft protection services, to redress the imminent and currently ongoing harm caused by the Data Breach.

86. **Typicality (Fed. R. Civ. P. 23(a)(3)).** Plaintiffs' claims are typical of those of the other Class Members because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffer from the same alleged violations of law as each other Class Member.

87. **Adequacy (Fed. R. Civ. P. 23(a)(4)).** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members and have no disabling conflicts of interest. Plaintiffs seek no relief antagonistic or adverse to the Class Members. Plaintiffs have retained counsel experienced in complex class-action and data-breach litigation.

88. **Superiority (Fed. R. Civ. P. 23(b)(3)).** Class litigation is the appropriate method for fair and efficient adjudication of the claims involved. Class treatment will permit a large number of Class Members to prosecute their common claims in a single forum, simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense; permit adjudication of relatively modest claims that Class Members could not individually afford to litigate; avoid inconsistent adjudications; and conserve judicial resources.

89. **Injunctive and Declaratory Relief Class (Fed. R. Civ. P. 23(b)(2)).** Rodenburg has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

90. **Issue Class (Fed. R. Civ. P. 23(c)(4)).** In the alternative, particular issues are appropriate for certification under Rule 23(c)(4), including but not limited to whether Rodenburg owed Plaintiffs and the Class a duty to use reasonable data security; whether Rodenburg's conduct breached that duty; and whether adherence to FTC Act, GLBA Safeguards Rule,

HIPAA, North Dakota statutory, and recognized industry-standard data-security measures would have reasonably prevented the Data Breach.

91. Adequate notice can be given to Class Members directly using information maintained in Rodenburg's records, including the same records used to send the Notice Letters.

## VI. CAUSES OF ACTION

### COUNT I

### NEGLIGENCE AND NEGLIGENCE PER SE

### (On Behalf of Plaintiffs and the Class)

92. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

93. Rodenburg solicited, gathered, received, and stored the Private Information of Plaintiffs and Class Members, including names, dates of birth, Social Security numbers, payment card numbers, medical conditions, and treatment information.

94. Rodenburg had full knowledge of the sensitivity of the Private Information entrusted to it, and of the types of harm Plaintiffs and Class Members could and would suffer if their Private Information were wrongfully disclosed to unauthorized persons.

95. Rodenburg owed Plaintiffs and each Class Member a duty to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

96. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices by Rodenburg, and had no ability to protect their Private Information once it was in Rodenburg's possession.

97. Rodenburg's duty of care obligated it to implement and maintain processes through which it could promptly detect and respond to unauthorized access, and to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats.

98. Rodenburg owed duties to Plaintiffs and the Class to (i) provide data security consistent with industry standards and legal and regulatory requirements; and (ii) ensure that its systems and networks, and the personnel responsible for them, adequately protected Plaintiffs' and Class Members' Private Information.

99. Rodenburg had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including the unfair practice of failing to use reasonable measures to protect confidential data.

100. Rodenburg had a further duty under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq., and the FTC Safeguards Rule, 16 C.F.R. Part 314, to develop, implement, and maintain a comprehensive information-security program with appropriate administrative, technical, and physical safeguards.

101. Pursuant to HIPAA, 42 U.S.C. § 1320d et seq. and 45 C.F.R. Parts 160 and 164, Rodenburg, as a business associate, had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PHI from unauthorized disclosure and to render the electronic PHI it maintained "in a form unusable, unreadable, or indecipherable to unauthorized individuals." 45 C.F.R. § 164.304.

102. Pursuant to HIPAA's Breach Notification Rule, Rodenburg had a duty to provide notice of the Data Breach within 60 days of discovering it. 45 C.F.R. § 164.404(b).

103. Rodenburg also owed Plaintiffs and Class Members duties to safeguard their Private Information arising from the North Dakota Notice of Security Breach for Personal Information statute, N.D. Cent. Code ch. 51-30, and from the North Dakota Rules of Professional Conduct.

104. Rodenburg breached its duties to Plaintiffs and Class Members under each of these sources of law and standards by, among other things, failing to provide fair, reasonable, or adequate computer systems and data-security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to encrypt or timely delete the Private Information from its network; failing to detect, contain, and remediate the intrusion in a timely manner; and failing to timely or adequately notify or warn Plaintiffs and Class Members about the Data Breach.

105. Rodenburg's violations of the FTC Act, the Gramm-Leach-Bliley Act and Safeguards Rule, HIPAA, and N.D. Cent. Code ch. 51-30 directly caused and were a substantial factor in the Data Breach and the resulting injuries to Plaintiffs and Class Members.

106. Plaintiffs and Class Members are within the class of persons each of these statutes was intended to protect, and the type of harm that resulted from the Data Breach is the type of harm each statute was intended to guard against. Rodenburg's failure to comply with these statutes accordingly constitutes negligence per se.

107. Rodenburg's specific negligent acts and omissions include, without limitation: (a) failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information; (b) failing to adequately train its employees on proper cybersecurity protocols; (c) failing to adequately monitor the security of its information-technology networks and systems; (d) failing to ensure its network systems were

periodically tested and that it maintained reasonable data-security safeguards; (e) allowing unauthorized access to Plaintiffs' and Class Members' Private Information; and (f) failing to timely notify Plaintiffs and Class Members of the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

108. But for Rodenburg's wrongful and negligent breaches of its duties to Plaintiffs and Class Members, the Data Breach would not have occurred, or at least would have been substantially mitigated, and Plaintiffs' and Class Members' Private Information would not have been compromised.

109. It was foreseeable that Rodenburg's failures to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would injure Plaintiffs and Class Members. The breach of security was reasonably foreseeable to Rodenburg given the high frequency of cyberattacks and data breaches against debt collectors and law firms—including the documented Akira law-firm campaign that preceded the Rodenburg attack.

110. As a direct and proximate result of Rodenburg's negligence and negligence per se, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including, without limitation, (i) invasion of privacy; (ii) lost or diminished value of their Private Information; (iii) actual identity theft, payment-card fraud, and medical-identity fraud; (iv) lost opportunity costs and lost time associated with attempting to mitigate the consequences of the Data Breach; (v) loss of benefit of the bargain; and (vi) the continued and certainly increased risk to their Private Information, which remains in Rodenburg's possession and is subject to further unauthorized disclosures.

111. Plaintiffs and Class Members are entitled to compensatory, punitive, and nominal damages in an amount to be proven at trial, together with appropriate equitable relief.

## COUNT II
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
## (On Behalf of Plaintiffs and the Class)

112. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

113. Rodenburg entered into uniform written contracts with its creditor-clients to provide debt-collection and creditors'-rights legal services in connection with Plaintiffs and Class Members.

114. Pursuant to those contracts, Rodenburg received from its clients and maintained Plaintiffs' and Class Members' Private Information in the course of performing its contractual services, which it could not perform without receiving and maintaining such Private Information.

115. Pursuant to those contracts, Rodenburg agreed, in part, to implement adequate data-security measures to safeguard Plaintiffs' and Class Members' Private Information from unauthorized disclosure, and to timely notify Plaintiffs and Class Members in the event of a Data Breach.

116. Rodenburg was required by statutes and regulations—including, without limitation, the Gramm-Leach-Bliley Act and Safeguards Rule, the FTC Act, the FDCPA, HIPAA (including the requirement of HIPAA-compliant business-associate agreements with its healthcare-organization clients), and the North Dakota Notice of Security Breach for Personal Information statute—to have contracts with its clients requiring Rodenburg to implement and maintain reasonable security procedures and practices to protect Plaintiffs' and Class Members' Private Information from unauthorized access, use, or disclosure.

117. These contracts were made expressly and impliedly for the benefit of Plaintiffs and Class Members as the intended third-party beneficiaries.

118. Rodenburg breached these contracts by, among other acts and omissions, (i) failing to use reasonable data-security measures; (ii) failing to implement adequate protocols and employee training sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure; and (iii) failing to promptly or adequately notify Plaintiffs and Class Members of the Data Breach.

119. As a direct and proximate result of Rodenburg's breach, Plaintiffs and Class Members have suffered and will continue to suffer the injuries and damages described herein.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class, in the alternative)**

120. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

121. Through the use of Plaintiffs' and Class Members' Private Information, Rodenburg received substantial monetary benefits.

122. Without the acceptance and use of Plaintiffs' and Class Members' Private Information, Rodenburg could not have provided debt-collection and legal services to its clients or generated revenue therefrom.

123. Rodenburg appreciated that a monetary benefit was being conferred upon it and accepted that benefit while saving the costs it reasonably should have expended on data-security measures to secure Plaintiffs' and Class Members' Private Information.

124. Under the principles of equity and good conscience, Rodenburg should not be permitted to retain the benefit it derived from Plaintiffs' and Class Members' Private Information because it failed to implement appropriate data-management and security measures.

125. Plaintiffs and the Class are accordingly entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiffs and the Class.

**COUNT IV**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the Class)**

126. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

127. Plaintiffs and Class Members had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information—including their Social Security numbers, dates of birth, payment card numbers, and medical condition and treatment information—and were entitled to the protection of that information against disclosure to unauthorized third parties.

128. Rodenburg owed a duty to Plaintiffs and the Class to keep their Private Information confidential.

129. The unauthorized acquisition by a third party of Plaintiffs' and Class Members' Private Information is highly offensive to a reasonable person.

130. The intrusion was into a place or thing that was private and entitled to be private. Plaintiffs' and the Class's Private Information was disclosed to Rodenburg in connection with debt-collection-related legal services, with the intention and reasonable expectation that the information would be kept confidential and protected from unauthorized disclosure.

131. Rodenburg acted with a knowing state of mind by permitting the Data Breach despite knowing that its information-security practices were inadequate, and by failing to timely notify Plaintiffs and the Class of the Data Breach in a manner that materially impaired their mitigation efforts.

132. As a proximate result of Rodenburg's acts and omissions, Plaintiffs' and the Class's Private Information was stolen by criminal third parties and is now available for harmful publication and re-disclosure without authorization, causing Plaintiffs and the Class to suffer damages, including damages for loss of privacy, emotional distress, and the diminished value of the privacy interests invaded.

**COUNT V**

**VIOLATION OF THE NORTH DAKOTA NOTICE OF SECURITY BREACH FOR PERSONAL INFORMATION STATUTE, N.D. CENT. CODE § 51-30-01 et seq.**

**(On Behalf of Plaintiffs Bourne and Himmelspach and the North Dakota Subclass)**

133. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

134. Rodenburg is a "person" that owns or licenses computerized data that includes "personal information" within the meaning of N.D. Cent. Code § 51-30-01.

135. Plaintiffs' and the North Dakota Subclass Members' names, in combination with their unencrypted Social Security numbers, dates of birth, payment card numbers, and other identifiers, constitute "personal information" under N.D. Cent. Code § 51-30-01(4).

136. North Dakota law required Rodenburg to disclose any breach of the security of the system to any resident of North Dakota whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person, in the most expedient time possible and without unreasonable delay. N.D. Cent. Code § 51-30-02(1).

137. North Dakota law also required Rodenburg, when more than 250 individuals were affected, to disclose the breach to the Attorney General of North Dakota by mail or email. N.D. Cent. Code § 51-30-02(2).

138. Rodenburg violated these requirements by failing to provide notice in the most expedient time possible and without unreasonable delay—delaying notification by approximately seven months from its discovery of the unauthorized access on August 26, 2025—and by failing to provide complete and accurate notice of the Data Breach as required.

139. As a direct and proximate result of Rodenburg's violations, Plaintiffs and the North Dakota Subclass Members suffered the damages described herein and are entitled to all remedies available under North Dakota law, including actual damages and equitable relief.

**COUNT VI**

**VIOLATION OF THE NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING PRACTICES ACT, N.D. CENT. CODE § 51-15-01 et seq.**

**(On Behalf of Plaintiffs and the North Dakota Subclass)**

140. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

141. The North Dakota Unlawful Sales or Advertising Practices Act prohibits "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." N.D. Cent. Code § 51-15-02. "Merchandise" includes services. Id. § 51-15-01(3).

142. Rodenburg engaged in deceptive acts and practices in connection with the sale and advertisement of its services by, among other things, representing that it would maintain reasonable safeguards over consumer Private Information while failing to do so;

misrepresenting and omitting material facts regarding its data-security practices; and failing to timely or accurately disclose the nature, scope, and root cause of the Data Breach.

143. Plaintiffs and the North Dakota Subclass Members were injured as a result of Rodenburg's deceptive acts and practices and are entitled to actual damages, together with such other relief as is provided by N.D. Cent. Code § 51-15-09, including treble damages and reasonable attorneys' fees.

**COUNT VII**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiffs and the Class)**

144. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

145. Under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary supplemental relief.

146. In the fallout of the Data Breach, a controversy has arisen regarding Rodenburg's duties to use reasonable data security for the Private Information it collects and maintains, and Plaintiffs and Class Members continue to suffer injuries from the ongoing threat of fraud and identity theft due to Rodenburg's inadequate data-security measures.

147. This Court should enter a judgment declaring that: (a) Rodenburg owed and continues to owe a legal duty to use reasonable data security to safeguard the Private Information entrusted to it; (b) Rodenburg has a duty to provide complete and accurate notice of the Data Breach under the common law, Section 5 of the FTC Act, the GLBA Safeguards Rule, HIPAA, and N.D. Cent. Code ch. 51-30; (c) Rodenburg breached, and continues to breach, its duties by failing to use reasonable measures to protect the Private Information entrusted

to it from unauthorized access, use, and disclosure; and (d) Rodenburg's breaches of its duties caused, and continue to cause, injuries to Plaintiffs and Class Members.

148. The Court should also issue injunctive relief requiring Rodenburg to (a) implement and maintain industry-standard administrative, technical, and physical safeguards designed to protect Plaintiffs' and Class Members' Private Information; (b) provide a full and accurate disclosure of the nature, scope, and root cause of the Data Breach; and (c) provide, at Rodenburg's own expense, lifetime credit-monitoring and identity-theft protection services to Plaintiffs and the Class—not the inadequate twelve months Rodenburg has offered.

149. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury and lack an adequate legal remedy, and the public will benefit from an injunction preventing further injury caused by Rodenburg's inadequate data-security practices.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray that this Court enter judgment in their favor and against Rodenburg as follows:

A. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class and North Dakota Subclass, appointing Plaintiffs as class representative, and appointing the undersigned counsel as Class Counsel;

B. Awarding Plaintiffs and the Class compensatory, actual, statutory, nominal, exemplary, and punitive damages, as allowed by law;

C. Awarding restitution and disgorgement to Plaintiffs and the Class in an amount to be determined at trial;

D. Awarding declaratory relief as set forth herein;

E. Awarding injunctive relief in the form of additional technical and administrative cybersecurity controls, full and accurate disclosure of the Data Breach, and lifetime credit-monitoring and identity-theft protection services for Plaintiffs and the Class;

F. Awarding attorneys' fees, costs, and expenses, including under N.D. Cent. Code § 51-15-09 and any other applicable fee-shifting statute, common-law doctrine, or rule;

H. Awarding pre-judgment and post-judgment interest, as provided by law; and

I. Granting such further and additional relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and all others similarly situated, demand a trial by jury on all issues so triable.

Dated: April 30, 2026.

Respectfully submitted,

/s/ John Heenan
John Heenan (ND Bar ID# 07223)
HEENAN & COOK, PLLC
1631 Zimmerman Trail
Billings, Montana 59102
Telephone: (406) 839-9091
Email: john@lawmontana.com

Thomas A. Dickson (ND Bar ID# 03800)
DICKSON LAW OFFICE
P.O. Box 1896
Bismarck, ND 58502-1896
Telephone: (701) 222-4400
Email: tdickson@dicksonlaw.com

Raph Graybill (MT Bar ID# 36478523)
GRAYBILL LAW FIRM
300 4th St. N
Great Falls, Montana 59401
Telephone: (406) 452-8566
Email: raph@graybilllawfirm.com

*Counsel for Plaintiffs and the Putative Class*